IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:25-mj-373 |
| v. ) | |
| ) | |
| PETER ANDREW STINSON, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF PRETRIAL RELEASE ON CONDITIONS

The government has filed a criminal complaint alleging that Mr. Stinson violated 18 U.S.C. § 871 based upon statements made on social media platforms. Mr. Stinson is a decorated veteran of the United States Coast Guard who served his country with distinction for over three decades, achieving the rank of Lieutenant. He has deep ties to his community, is a devoted father of five children, has no prior criminal history, and poses no risk of flight or danger to the community. The Pretrial Services Report recommends his release based on his PTRA score of 1, reflecting a 95% likelihood of successful pretrial supervision. Because the government cannot satisfy its burden to establish that no combination of release conditions would reasonably assure Mr. Stinson's appearance and the safety of the community, and because his alleged conduct falls squarely within the protection of the First Amendment, the Court should order his pretrial release under appropriate conditions.

## Introduction

The charges against Mr. Stinson arise from political commentary posted on social media platforms over a period of several years. While the government characterizes these posts as "threats," they constitute political advocacy that the First Amendment was squarely designed to protect. Specifically, Mr. Stinson's statements lack the specificity, imminence, and likelihood of producing lawless action required to fall outside constitutional protection. Moreover, his repeated disclaimers of his own ability to carry out violence, coupled with his abstract encouragement of others, places his speech squarely within the realm of protected political advocacy.

Significantly, the scope of First Amendment protection for political speech—even speech that could be construed as encouraging violence—has been demonstrated by statements from political figures across the spectrum, including President Donald Trump, who has made similar statements that encourage violence against political opponents without facing criminal prosecution. This underscores that Mr. Stinson's conduct falls within the bounds of protected political discourse in our democracy.

## ARGUMENT

### I. The Court Must Consider All Reasonable Less Restrictive Alternatives to Detention

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act of 1984 therefore provides that a defendant must be released on their personal recognizance or an unsecured personal bond "unless the judicial officer determines that such release will not reasonably assure the appearance of

the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Under circumstances in which a personal recognizance bond is insufficient, the Court must choose "the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(c)(1)(B). In other words, the Court must consider all reasonable less restrictive alternatives to detention. *See* § 3142(e).

## II. The Government Bears the Burden of Persuasion Even in a Presumption Case

To support a finding that the defendant should be detained, the government must show: (1) by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community, § 3142(f); or (2) evidence that no condition or combination of conditions will reasonably assure the appearance of the defendant as required. *See United States v. King*, 849 F.2d 485, 489 (11th Cir. 1988); 18 U.S.C. § 3142(f).

In a case involving a charge that triggers a rebuttable presumption that no such conditions exist, 18 U.S.C. § 3142(e), this statutory presumption shifts "the burden of production to the defendant, but the burden of persuasion remains with the government." 3B Wright & Miller, Federal Practice & Procedure § 765.1; *accord United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) ("Even in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community."). In other words, even in the context of a statutory presumption case, the defendant only has a

3

burden of production to come forward with "some evidence" to contradict the presumption that no conditions exist that will reasonably assure the safety of the community and reasonably assure the defendant's appearance. *See United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *accord United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("As our sister circuits have found, section 3142(e)(3)'s presumption in favor of detention imposes only a 'burden of production' on the defendant, and the government retains the 'burden of persuasion.'").

This burden of production "is not a heavy one to meet." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986). The defendant simply has the burden to produce evidence "to suggest" that he is neither dangerous nor likely to flee if released on bail. *United States v. Quartermaine*, 913 F.2d 910, 916 (11th Cir. 1990). The burden of production is merely "to offer some credible evidence contrary to the statutory presumption." *United States v. Miller*, 625 F.Supp. 513, 519 (D. Kan. 1985). "Any evidence" favorable to a defendant that comes within a category listed in 18 U.S.C. § 3142(g) can rebut the presumption, including evidence of the person's character, mental condition, employment, financial resources, length of residence in the community, community ties, past conduct, prior history related to drug or alcohol abuse, criminal history, and nature and seriousness of the danger that would be posed by the person's release. 18 U.S.C. § 3142(g)(3); *Dominguez*, 783 F.2d at 707. Where the defendant has presented considerable evidence of his longstanding ties to the locality in which he faces trial, the presumption has been rebutted. *See United States v. Jackson*, 845 F.2d 1262, 1266 (5th Cir. 1988).

4

If the defendant proffers evidence to rebut the presumption, the court must consider four factors in determining whether the government has met its burden of persuasion regarding pretrial detention: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to the community that would be posed by the person's release. 18 U.S.C. § 3142(g). *See Hir*, 517 F.3d at 1086; *Jackson*, 845 F.2d at 1265.

In meeting its burden, the government cannot simply argue that the statutory presumption, coupled with the allegations in the charging document, are alone sufficient to satisfy section 3142(g). *Jackson*, 845 F.2d at 1266. The government is required to make a serious attempt to supports its request for pretrial detention by offering extrinsic incriminatory evidence. *Id*. Moreover, the "presumption by itself would be inadequate to prove dangerousness, so the prosecution must introduce other evidence in addition." *United States v. Cox*, 635 F. Supp. 1047, 1052 (D. Kan. 1986). Thus, when the presumption is preliminarily rebutted, it is improper to base a finding of dangerousness solely on the presumption. *Dominguez*, 783 F.2d at 707.

Even if the presumption of dangerousness to the community exists under 18 U.S.C. § 3142(e), the defendant cannot be detained unless the government proves, and the Court finds, that there are no release conditions that will "reasonably assure" the safety of the community. *See Hir*, 517 F.3d at 1092; *Dominguez*, 783 F.2d at 707. The Bail Reform Act contemplates only that a court be able to "reasonably assure," rather than guarantee, the safety of the community. *Hir*, 517 F.3d at 1092.

5

Moreover, the government must show inclination to flee, as opposed to the mere opportunity, in order to support pretrial detention. *See Truong Dinh Hung*, 439 U.S. at 1329.

### III. Mr. Stinson's Substantial Ties to the Community, His Family and his History of Service to his Country Weigh in Favor of Release

#### A. Mr. Stinson's History and Characteristics Reflect Patriotism and Deep Ties to the Community

Peter Stinson is a 57-year-old decorated veteran who served his country honorably in the United States Coast Guard for over three decades (1988-2021), achieving the rank of Lieutenant. During his distinguished military career, he served as an instructor for FEMA's Incident Command Systems. He earned a master's degree in National Security and Strategic Studies from the United States Naval War College, demonstrating his commitment to understanding and protecting American security interests.

Mr. Stinson is a devoted father of five children and has deep roots in the Northern Virginia community where he has resided for years. He is currently organizing the Mayday Movement, a constitutionally protected political protest seeking the impeachment of President Trump through lawful democratic processes. The Mayday Movement prides itself on organizing continuous, peaceful protests. His permit for this protest demonstrates his commitment to working within the legal system to express his political views.

According to the Pretrial Services Report, Mr. Stinson has a PTRA score of 1, which correlates with a 95% likelihood of success when released from pretrial

6

confinement. He has no significant criminal history and poses no risk of flight given his extensive ties to the community and his family responsibilities.

### B. Mr. Stinson Does Not Pose a Risk of Flight

Inclination to flee must be shown to support pretrial detention based upon risk of flight. *See Truong Dinh Hung v. United States*, 439 U.S. 1326, 1329 (1978) (application to Circuit Justice). In *Truong Dinh Hung*, bond was approved for a Vietnamese national convicted of espionage in violation of 18 U.S.C. § 794 notwithstanding the lack of a permanent residence in the United States and the inability to extradite Mr. Truong if he fled to Vietnam. *Id.* The government cannot establish that Mr. Stinson poses any risk of flight. His decades of service to his country, his role as a father of five children, his ongoing leadership of a lawful political movement, and his deep community ties all demonstrate his commitment to remaining in the jurisdiction. Moreover, his repeated disclaimers on social media about lacking the "skills" or "ability" to carry out violence reflect the reality that he poses no danger to the community. Given Mr. Stinson's extensive ties to this community and his family, the government cannot establish by any measure that he poses a risk of failing to appear at future court appearances.

## IV. Mr. Stinson's Alleged Conduct Constitutes Protected Political Speech Under the First Amendment.

### A. The Nature of the Charged Offense and Weight of the Evidence Do Not Require Detention.

"[T]he weight of the evidence is the least important of the various factors" to be considered by the Court in determining whether conditions exist which will

reasonably assure the appearance of Mr. Stinson. *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (panel opinion by Kennedy, J.). The weight of the evidence is the least important factor because Mr. Stinson is presumed to be innocent. *See* § 3142(j). Moreover, pretrial detention is explicitly not permitted to be imposed as "punishment" for alleged past criminal conduct, no matter how well established. *United States v. Salerno*, 481 U.S. 739, 747 (1987). On the contrary, "[t]he [Bail Reform Act], by its nature, is always looking forward. To be sure, the Court should consider past behavior in assessing the likelihood of prohibited behavior in the future, but the Government needs to show that there is a serious risk that these potential harms exist going forward." *United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009). In other words, the weight of the evidence is relevant only to the extent that it supports a finding that Mr. Stinson presents an unaddressable risk of flight or danger.

The Complaint alleges that Mr. Stinson violated 18 U.S.C. § 871, which prohibits "knowingly and willfully" making "any threat to take the life of, to kidnap, or to inflict bodily harm upon" the President of the United States. 18 U.S.C. § 871(a). The elements of that offense are (1) that a defendant said words that constitute a threats to kill, to kidnap, or to inflict bodily harm upon the President of the United States, (2) that the words were a "true threat," and (3) that the defendant made the threat knowingly and willfully. *See* 18 U.S.C. § 871(a); *United States v. Patillo*, 431 F.2d 293, 295 (4th Cir. 1970). In addition, the government must show that the defendant "had some understanding of his statements' threatening character."

*Counterman v. Colorado*, 600 U.S. 66, 73 (2023).

To prove that a statement is a true threat, the government must prove that (1) "a defendant intentionally ma[de] a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual," *Elonis v. United States*, 575 U.S. 723, 731 (2015), and (2) "the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence," *Counterman*, 600 U.S. at 69. Where "a true threat against the person of the President is uttered without communication to the President intended, the threat can form a basis for conviction under the terms of Section 871(a) only if made with a present intention to do injury to the President." *Patillo*, 431 F.2d at 297-98.

Here, the government's case rests entirely on Mr. Stinson's exercise of his First Amendment rights. The absence of any evidence of specific planning, preparation, or capability to carry out violence, combined with his repeated disclaimers and abstract nature of his statements, establishes that the government will face significant constitutional challenges in prosecuting this case, as discussed below.

### B. The First Amendment Protects Political Hyperbole, Including Offensive Statements Expressing Extreme Political Opposition to the President.

The First Amendment "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United*

9

*States v. Stevens,* 559 U.S. 460, 468 (2010). Moreover, protecting political speech is a primary objective of the First Amendment. *See Mills v. Alabama*, 384 U.S. 214, 218 (1966). Because "[t]he language of the political arena ... is often vituperative, abusive, and inexact[,]" the First Amendment protects "political hyperbole" and "crude offensive method[s] of stating a political opposition to the President." *Watts v. United States*, 394 U.S. 705, 708 (1969).

In *Watts*, for example, an eighteen-year-old Vietnam draftee, in discussing police brutality at a public rally, remarked, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." 394 U.S. at 706. The Supreme Court overturned Watts' conviction for making a threat against the President under 18 U.S.C. § 871, holding that the government must prove the defendant made a "true threat," not just "political hyperbole." *Id.* at 708. Furthermore, the fact that the defendant's statements were made in a public forum rather than in a private communication directed at the President weighed against classification of the statement as a "true threat."

Moreover, the Supreme Court has long held that the First Amendment protects advocacy even of unlawful action so long as that advocacy is not "directed to inciting or producing imminent lawless action and [ ] likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). In other words, "advocacy of illegal action at some indefinite future time[] … is not sufficient to permit the State to punish [] speech." *Hess v. Indiana*, 414 U.S. 105, 108 (1973).

Critically, "the teaching of the moral propriety or even moral necessity for a

10

resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." *Noto v. United States*, 367 U.S. 290, 297-98 (1961). In other words, "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002). Likewise, general advocacy of violence contingent upon non-imminent future events fails to satisfy *Brandenburg*'s imminence requirement. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 900 n.28, 928 (1982) (holding statement by an N.A.A.C.P. official threatening to break the necks of black residents if they violated a boycott on stores that enforced segregation "did not transcend the bounds of protected speech set forth in Brandenburg").

### C. Membership in Groups that Advocate Violence is Protected by the First Amendment.

The Affidavit in support of the criminal complaint states that Mr. Stinson has identified himself as a member of "Antifa," a term that "refers to individuals who oppose fascism." Aff. ¶ 7. The Affidavit also states that "[s]uch groups have been known to engage in coordinated tactics (black-bloc) to impede law enforcement and to use violence to further their cause." *Id.*

This country certainly has had experience with disfavored groups such as, for example, the Communist Party that advocated the use of force and even the overthrow of the government. But "mere Party membership, even with knowledge of the Party's unlawful goals, cannot suffice to justify criminal punishment[.]" *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 607 (1967); *cf. Dawson v. Delaware*, 503 U.S. 159, 165-67 (1992) (holding that defendant's First Amendment

11

rights were violated by admission of membership in white supremacist prison gang to establish defendant's abstract beliefs). It therefore cannot be a crime to say publicly that one belongs to ANTIFA. Nor does the Affidavit allege that Mr. Stinson has ever engaged in any coordinated tactics to impede law enforcement or used violence to further ANTIFA's cause.

### D. Abstract Encouragement of Others to Commit Non-Imminent Violence Is Protected Speech

The Supreme Court has made clear that "abstract advocacy" of unlawful conduct constitutes protected speech. *United States v. Williams*, 553 U.S. 285, 300 (2008). The Fourth Circuit has similarly held that the First Amendment protects "abstract advocacy" and struck down statutory prohibitions against "encouraging," "promoting," or "urging" others to engage in violence. *United States v. Miselis*, 972 F.3d 518, 539-41 (4th Cir. 2020).

Urging another person in the abstract to commit a non-imminent crime is thus protected by the First Amendment from criminal liability. *Brandenburg*, 395 U.S. at 447. In sum, the First Amendment bars criminalizing abstract encouragement of others to engage in non-imminent criminal conduct. *Miselis*, 972 F.3d at 541-42.

### E. Mr. Stinson's Statements Constitute Protected Abstract Advocacy

In *United States v. White*, 670 F.3d 498, 513 (4th Cir. 2012), *abrogated on other grounds by Elonis v. United States*, 575 U.S. 723 (2015), the Fourth Circuit held that online communications analogous to those at issue in this case that called for violence against another person did not constitute "true threats" for purposes of 18 U.S.C. § 875(c), which prohibits interstate communication of threats to injure

12

another person. In *White*, the defendant, a white supremacist, called on others to commit violence against a civil rights activist:

> The first of the two communications forming the basis for the conviction on Count 6 was a February 8 posting on a web-site that referenced the recent firebombing of a Canadian civil rights activist's house with the subscript, "**Good. Now someone do it to Warman.**" The second, in March 2008, was again a posting on White's website indicating that **Warman "should be drug [sic] out into the street and shot.**" It also asserted that "**Richard Warman is an enemy, not just to the white race but of all humanity and he must be killed.**" These communications clearly called for someone to kill Richard Warman. But neither communication actually provided a threat from White that expressed an intent to kill Warman. While a direct threat of that type would not always be necessary, for White to have called on others to kill Warman when the others were not even part of White's organization, amounted more to political hyperbole of the type addressed in *Watts* than to a true threat. Moreover, the two communications forming the basis for Count 6 were posted to neo-Nazi websites and not sent directly to Warman.

*White*, 670 F.3d at 513 (emphasis added). Based on these facts, the Fourth Circuit concluded that "the communications that formed the basis of Count 6 were expressions not directed to Warman but to the public generally and did not communicate an intent to take any action whatsoever." *Id.* Consequently, the court agreed that "the communications fell short of being true threats." *Id.*

An examination of Mr. Stinson's social media posts reveals that they fall squarely within the category of protected abstract advocacy that does not constitute a "true threat" to President Trump:

1. **Lack of Specificity**: Mr. Stinson's statements are general posts on social media platforms, not direct communications to President Trump, and lack specific plans, targets, timing, or methods. His posts about "somebody needs

13

to do it" or "someone should take the shot" are precisely the type of abstract encouragement that *Brandenburg* and *Miselis* protect, and that the Fourth Circuit concluded in *White* do not constitute "true threats."

2. **Lack of Imminence**: Mr. Stinson's posts span multiple years and contain no temporal element suggesting imminent action. Many posts are contingent on future political developments, similar to the protected speech in *Claiborne Hardware Co.*, 458 U.S. at 900. The fact that the Affidavit details public statements spanning from 2020 through 2025, without any corresponding action denoting intention to engage in violence, indicates that the statements at issue constitute political hyperbole reflecting deep-seated opposition to President Trump, not true threats.

3. **Disclaimers of Ability**: Throughout the relevant time period, Mr. Stinson repeatedly disclaimed his own ability to carry out violence, stating he lacks the "skills," is "not a good enough shot," and would serve only in a "support capacity." These disclaimers likewise demonstrate that his posts constitute political hyperbole rather than operational planning, and disclaim any personal intention to engage in violent conduct.

4. **Political Context**: Mr. Stinson's posts occurred in the context of political opposition to policies he views as fascistic. His organization of the Mayday Movement protest also demonstrates his commitment to lawful and peaceful political expression and democratic processes.

## V. The Scope of First Amendment Protection is Demonstrated By Similar Statements By Political Figures.

The boundaries of protected political speech have been tested and established through statements by political figures across the spectrum, including President Trump, who has made similar statements without facing criminal prosecution.

In 2016, for example, then-candidate Trump stated about Hillary Clinton: "If she gets to pick her judges, nothing you can do, folks. Although the Second Amendment people—maybe there is, I don't know." This statement, which could be construed as encouraging violence against a political opponent, was widely criticized but also recognized as protected political speech.

President Trump's speech on January 6, 2021, encouraging attendees to "fight like hell" and march to the Capitol, resulted in impeachment proceedings – but ultimately all criminal charges arising from this incident against President Trump were dismissed, demonstrating the high bar for criminalizing political speech.

In 2023, President Trump posted on Truth Social warning of "potential death and destruction" if he were criminally charged, another example of political speech that could be construed as encouraging violence but that remained within constitutionally-protected bounds.

These examples establish that the First Amendment provides robust protection for political speech, even when such speech could be interpreted as encouraging violence against political opponents. Mr. Stinson's statements, which are less specific and more clearly abstract than many of these examples, fall comfortably within this protected sphere.

## Conclusion

Mr. Stinson's decades of faithful service to his country, his role as a devoted father, his deep community ties, and his commitment to lawful political expression through the democratic process all weigh heavily in favor of pretrial release. His PTRA score of 1 reflects minimal risk, and no evidence suggests he poses a danger to the community or risk of flight.

Most importantly, the charges against Mr. Stinson criminalize political speech that falls squarely within First Amendment protection. His abstract advocacy for political change, coupled with his disclaimers of personal capability and his commitment to lawful protest, places his conduct within the broad protection the Constitution affords to political dissent.

WHEREFORE, Mr. Stinson respectfully requests that this Court authorize his release on conditions that may include home detention with time outs as authorized by Pretrial Services, as such conditions would reasonably assure his appearance and the safety of the community while preserving his constitutional rights.

Respectfully submitted,

Paul Andrew Stinson

By Counsel,

_____/s/_____
Geremy C. Kamens
Va. Bar No. 41596
Federal Public Defender

Brittany Davidson
Va. Bar No. 90660
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
Geremy_Kamens@fd.org